## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LATERAL RECOVERY LLC, as assignee of
BENCHMARK BUILDERS, INC., FTE
NETWORKS, INC., JUS-COM LLC and
FOCUS WIRELESS, LLC,

Plaintiffs,

v.

QUEEN FUNDING, LLC, YEHUDA KLEIN,
AND THE JOHN AND JANE DOE
INVESTORS,

Defendants.

Civ. A. No.:

## COMPLAINT

Plaintiffs Lateral Recovery LLC ("Lateral"), as Assignee Of Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC ("Focus" and together with the other assignors, "FTE") as and for its Complaint against Queen Funding, LLC ("Queen"), Yehuda Klein ("Klein"), and the John and Jane Doe Investors states as a follows:

## NATURE OF THE ACTION

1.     This is a RICO action against a merchant cash advance ("MCA") company that is controlled and manipulated by Yehuda Klein to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain millions of dollars in funds from FTE. Over the course of two years, the parties entered into seven so-called "Merchant Agreements" (the "Enterprise Agreements") pursuant to which Queen purportedly paid lump sums to purchase FTE's future receipts at a discount and FTE agree to repay the face value of its receipts through daily payments.  While couched as the purchase of future receipts, the agreements' terms,

conditions and the Defendants' actions demonstrate that despite the form of their agreements, no sale of receipts ever took place and the form was merely a sham to evade applicable usury laws. In reality, the transactions were loans that charged interest rates that exceeded not less than 100%, rates that are far greater than the maximum 25% permitted under New York Penal Law.

2.      In total, Plaintiffs received less than $6,500,000 from Defendants, and paid back $10,551,890.  In other words, Defendants charged Plaintiffs over $4,000,000 in interest in the span of just two years.

3.      It is against this backdrop that Lateral files this Complaint.

## THE PARTIES

4.      FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

5.      At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

6.      At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

7.      At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

8.      At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

9.      Defendant Queen Funding, LLC is a corporation duly organized and existing under the laws of the State of New Jersey with a principal place of business located at 122 East 42nd St., Suite 2112, New York, New York, 10168.

10.     Defendant Yehuda Klein is the principal owner of Queen and an adult resident and citizen of New Jersey.

11.     Upon information and belief, each of the John and Jane Doe Investor Defendants is a citizen of New York or New Jersey.

## JURISDICTION

12.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961–68.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

14.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## BACKGROUND

**A.     The Predatory MCA Industry**

15.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] *Id.*

admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated."[3]

16.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business. National Consumer Law Center, *supra*.

17.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

18.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The MCA Agreements Are Substantively And Procedurally Unconscionable.**

19.     The Enterprise Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

20.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving the Plaintiffs, are really loans.

---

[3] *Id.*

4

21.    Among these one-sided terms, the Enterprise Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to [the Enterprise]," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

22.    The Enterprise Agreements are also unconscionable because they contain numerous knowingly false statements.  Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

23.     The MCA agreements are also unconscionable because they are designed to fail. Among other things, the MCA agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

24.     The Enterprise Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

**C.     The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.**

25.     In order to evade state usury laws, the Enterprise includes a sham reconciliation provision in the Enterprise Agreements to give the appearance that the loans do not have a definite term.

26.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

27.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA

company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

28.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

29.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

30.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

31.     In fact, the Enterprise Agreements specifically require Queen to affirmatively reconcile the accounts each month, but it never did.

**D.     The Enterprise Intentionally Disguised the True Nature of the Transactions.**

32.     Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

> (a)     The daily payments required by the Enterprise Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;
>
> (b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default

7

and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)    While the Enterprise Agreements purported to "assign" all of the merchant's future account receivables to the Enterprise until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

(d)    Unlike true receivable purchase transactions, the Enterprise Agreements were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)    The amount of the daily payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)    The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)    The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)    The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## UNDERLYING FACTS

**A.    FTE Networks.**

33.    At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings.    The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.    The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation.    Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

34.    Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

35.    Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

36.    Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.    Lateral**

37.    On or about October 28, 2016, Lateral, as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-

Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

38.     FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

39.     Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

40.     In or around July 2019, FTE defaulted under the terms of the Credit Agreement. Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, without limitation, the claims asserted herein.

**C.     FTE Networks and the MCA Industry**

41.     In 2017, prior to defaulting under the Credit Agreement, FTE needed additional financing.  To procure that financing, FTE turned to the merchant cash advance industry, including the Enterprise MCA Companies.

42.     Like many MCA companies the Enterprise preys upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders.  Although their agreements are titled "Merchant Agreements" and purport to represent the sale/purchase of a businesses' future revenue, the Enterprise markets, underwrites and collects upon its transactions as loans, with interest rates far above those permissible under New York law.

43.    In their marketing, the Enterprise expressly describes the transactions as "loans" and describe themselves as "lenders."

44.    The Enterprise also consistently describes its products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

45.    The Enterprise also shows in its underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions, the Enterprise does not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

46.    When the Enterprise goes to collect upon its agreements, it treats them just like loans.   For example, it requires the merchant to make fixed daily payments and grant security interests to the Enterprise in substantially all of the merchant's assets to ensure that the daily payments are made.

47.    It also required the merchant to execute confessions of judgment that the Enterprise could file if the merchant failed to make as few as two daily payments under its agreements.   In other words, the Enterprise structures the transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

48.    FTE fell victim to all of these predatory tactics.

D.      **The Enterprise Loans to FTE.**

     **The Queen Transactions**

49.      Over a two-year period between November 20, 2017 and November 28, 2018, FTE entered into seven transactions with Queen pursuant to which Queen advanced FTE less than $6,500,000 in actual cash but collected in excess of an astounding $10,500,000.

     **The November 20, 2017 Loan**

50.      Under the November 20, 2017 agreement, Queen agreed to advance $100,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $149,900 (the "Purchased Amount") was repaid.

51.      The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $4,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just six weeks which, on its face, translates into an annual interest rate of more than 300% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

52.      Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in excess of $5,000.

53.      While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

     **The November 29, 2017 Loan**

54.      Under the November 29, 2017 agreement, Queen agreed to advance $400,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $599,600 (the "Purchased Amount") was repaid.

55.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $13,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just eight weeks which, on its face, translates into an annual interest rate of more than 300% per annum or more than 12 times the maximum 25% rate permitted under New York Penal Law.

56.     Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in excess of $30,000.

57.     While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

**The December 21, 2017 Loan**

58.     Under the December 21, 2017 agreement, Queen agreed to advance $760,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $1,139,240 (the "Purchased Amount") was repaid.

59.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $18,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just twelve weeks which, on its face, translates into an annual interest rate of more than 200% per annum or more than 8 times the maximum 25% rate permitted under New York Penal Law.

60.     Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in in excess of $35,000.

61.     While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due

diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

**The July 24, 2018 Loan**

62.     Under the July 24, 2018 agreement, Queen agreed to advance $750,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $1,1244,250 (the "Purchased Amount") was repaid.

63.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $13,226 (a "Daily Payment") such that the Purchased Amount would be repaid in just sixteen weeks which, on its face, translates into an annual interest rate of more than 150% per annum or more than 6 times the maximum 25% rate permitted under New York Penal Law.

64.     Even worse, Queen did not advance FTE the full Purchased Amount. Instead, Queen charged an Origination and ACH Program Fee in excess of $75,000.

65.     While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

**The August 10, 2018 Loan**

66.      Under the August 10, 2018 agreement, Queen agreed to advance $1,1650,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $2,548,300 (the "Purchased Amount") was repaid.

67.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $28,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just

sixteen weeks which, on its face, translates into an annual interest rate of more than 150% per annum or more than 6 times the maximum 25% rate permitted under New York Penal Law.

68.    Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in excess of $75,000.

69.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

### The August 30, 2018 Loan

70.    Under the August 30, 2018 agreement, Queen agreed to advance $1,900,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $2,848,100 (the "Purchased Amount") was repaid.

71.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $29,200 (a "Daily Payment") such that the Purchased Amount would be repaid in just twenty weeks which, on its face, translates into an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

72.    Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in excess of $170,000.

73.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

**The November 28, 2018 Loan**

74.    Under the November 28, 2018 agreement, Queen agreed to advance $1,250,000 (the "Purchase Price") to FTE in exchange for the purported purchase of all of FTE's Future Receipts until such time as the amount of $2,112,500 (the "Purchased Amount") was repaid.

75.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $49,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just eight weeks which, on its face, translates into an annual interest rate of more than 200% per annum or more than 8 times the maximum 25% rate permitted under New York Penal Law.

76.    Even worse, Queen did not advance FTE the full Purchased Amount.  Instead, Queen charged an Origination and ACH Program Fee in the amount of $140,000.

77.    While the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Origination Fee and ACH Program Fee were merely additional disguised interest.

**FIRST CAUSE OF ACTION**
**(RICO:  18 U.S.C. § 1962)**

78.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

79.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

80.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

81.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on

Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

82.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

83.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

84.    As noted above, loan-sharks with full knowledge of the prior law, made it a

85.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

86.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

87.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.    Culpable Persons.**

88.    Klein and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

89.    At all relevant times, each of Klein and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

90.    Klein has an ownership interest in Queen and is the mastermind of the Enterprise.

91.    The John and Jane Doe Investors are individuals and business entities that provide funding for the loans.

92.    Through their operation of Queen, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.    The Enterprise.**

93.    Klein, Queen, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

94.    Klein, Queen, and the John and Jane Doe Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

95.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

96.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it

violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

97.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

98.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

99.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    Yehuda Klein**

100.    Klein is an owner and the mastermind of the Enterprise.  He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

101.    In his capacity as the mastermind of the Enterprise, Klein is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the

Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

102.    Klein has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

103.    Klein has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Queen and to the John and Jane Doe Investors.

**ii.    Queen**

104.    Queen is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Klein and the John and Jane Doe Investors.

105.    Klein and the John and Jane Doe Investors have operated Queen as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Queen has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be

charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

106.    In this case, Queen, through Klein and the John and Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of FTE.

### iii.    The John and Jane Doe Investors

107.    The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Queen and Klein.

108.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Queen with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

109.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

E.    **Interstate Commerce**

110.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

111.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

112.    In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

113.    In addition, at the direction of Defendants, each of the Agreements was executed in states outside of New York, and original copies of the Agreements and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New York via Federal Express using labels prepared by Defendants.

F.    **Injury and Causation.**

114.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

115.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited

to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

116.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

117.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

118.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

119.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

120.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

121.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

122.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

123.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

124.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

125.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

126.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

127.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a)   Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)   Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)   Awarding treble damages;

d)   Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)   Any further relief deemed appropriate by the Court.

Dated:  November 19, 2021

**WHITE AND WILLIAMS LLP**

By:_____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

25