UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LATERAL RECOVERY LLC, et al.,                        :
                              Plaintiffs,     :
                                       :              21 Civ. 9607 (LGS)
         -against-                                     :
                                       :              OPINION AND ORDER
QUEEN FUNDING, LLC, et al.,                          :
                            Defendants.  :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiffs bring this civil action against Defendants Queen Funding, LLC ("Queen Funding"), Yehuda Klein and John and Jane Doe Investors in Queen Funding who funded its operations. Plaintiffs allege that Queen Funding, which is a merchant cash advance ("MCA") company, Klein and other affiliated investors violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., by engaging in wire fraud and collecting unlawful debt. Defendants move to dismiss both the RICO substantive claim and the RICO conspiracy claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, Defendants' motion is denied.

## I.      BACKGROUND

The following facts are taken from the Complaint and documents attached to, or incorporated by reference in, the Complaint and are construed in the light most favorable to Plaintiffs. *See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

Plaintiffs include FTE Networks, Inc., and its three subsidiaries Benchmark Builders, Inc., Jus-Com LLC and Focus Wireless, LLC (collectively, "FTE"). Plaintiff Lateral Recovery LLC is an assignee of FTE's claims pursuant to a foreclosure.

Defendant Queen Funding is an MCA company controlled by Klein that provides funds to small businesses through MCA agreements. Between November 2017 and November 2018, the parties here entered into seven MCA Agreements (the "Merchant Agreements"). Under each Merchant Agreement, Queen Funding purported to purchase a portion of Plaintiffs' receivables in exchange for up-front payments to FTE. The Merchant Agreements specify a purchase price to be paid by Queen Funding, a dollar amount of receivables purchased, the percentage of the merchant's total receivables that the purchase purportedly represents and a daily payment amount to be paid by FTE. FTE's daily payment was debited directly from an FTE bank account. The daily payment amount purported to be a "good-faith estimate of the percentage of receivables purchased" for that month, which in each Merchant Agreement was 13%, regardless of the amount actually purchased. Under the Merchant Agreements, Queen Funding advanced FTE approximately $6,500,000 in cash but collected about $10,500,000 in daily payments during a two-year period. Each Merchant Agreement had an effective annual interest rate between 100% and 300%.

For example, under the parties' first Merchant Agreement, Queen Funding purchased $149,900 of FTE's receivables for a purchase price of $100,000. Queen Funding actually advanced $95,000 to FTE, which was the purchase price less a fee of $5,000. The amount of receivables purchased purportedly represented 13% of FTE's total receivables, resulting in a daily payment by FTE of $4,999 to be paid over six weeks. FTE's payments in this first Merchant Agreement had an equivalent effective annual interest rate of 300% per annum.

The Merchant Agreements include provisions that grant Defendants the irrevocable right to withdraw money directly from FTE's bank accounts -- including collecting checks and signing invoices in FTE's name -- and that prohibit FTE from transferring, moving or selling the

business or any assets without permission from Defendants.  The Merchant Agreements also contain numerous default and remedy provisions.  One of these states that an "Event of Default" occurs when "the attempted ACH debit of the [daily payment amount] is rejected two times during the term of [the] Agreement and Merchant does not contact [Queen Funding] in advance of the ACH debit being rejected."  The "Protections against Default" provision states that, upon any of the several events of default listed, "the full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately."  The Merchant Agreements also allow Defendants to collect on the personal guaranty by the borrower's individual owners if Plaintiffs are unable to pay or are bankrupt.

## II.    LEGAL STANDARD FOR MOTION TO DISMISS

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations."  *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] [plaintiff's] claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, "plaintiffs must provide the grounds upon which [their]

claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

## III.   DISCUSSION

### A.  RICO Legal Standard

To state a civil RICO claim under 18 U.S.C. § 1964, a complaint must plead (1) "that the individual defendants committed a substantive RICO violation" and (2) "that the violation proximately caused an injury to [the plaintiffs'] business or property." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 196 (2d Cir. 2019); *see also* 18 U.S.C. § 1964(c) (providing a private right of action for persons injured "by reason of" a substantive RICO violation).

To plead a substantive RICO violation, a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or "through . . . collection of unlawful debt."  18 U.S.C. § 1962(c); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 n.1 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018).  "Racketeering activity," for purposes of RICO, includes "any 'act' indictable under various specified federal statutes, including the mail and wire fraud statutes . . . ." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citing 18 U.S.C. § 1961(1)).  A RICO claim must allege every essential element of each predicate act.  *See, e.g.*, *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (dismissing a RICO claim where the complaint failed to plead predicate acts of mail fraud with particularity).

Conspiracy to violate § 1962(c) is also actionable under § 1964.  *See* 18 U.S.C. §§ 1962(d), 1964.  To state a RICO conspiracy, a plaintiff must allege "the existence of an

agreement to violate RICO's substantive provisions." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (internal quotation marks omitted).  If a complaint fails to state a substantive RICO claim, it also does not state a claim for RICO conspiracy.  *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998); *Nygard v. Bacon*, No. 19 Civ. 1559, 2021 WL 3721347 at *3 (S.D.N.Y. Aug. 20, 2021).  The Complaint alleges a violation of RICO and a RICO conspiracy under two independent theories of (1) a pattern of racketeering activity based on wire fraud and (2) the collection of unlawful debt.

### B.  Pattern of Racketeering Activity -- Wire Fraud

#### 1.  Wire Fraud

Defendants argue that the Complaint fails to plead with particularity a RICO predicate act of wire fraud.  This argument is incorrect; the Complaint pleads wire fraud with particularity.

Under RICO, wire fraud is one of the predicate offenses that constitute "racketeering activity."  18 U.S.C. 1961(1).  "The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of [interstate] mails or wires to further the scheme."  *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks omitted) (second alteration added); *see* 18 U.S.C. § 1343.  Where an alleged predicate act sounds in fraud, such as wire fraud, the plaintiff "must state with particularity the circumstances constituting fraud or mistake."  *Lundy*, 711 F.3d at 119 (regarding pleading standard for predicate act of mail fraud for RICO claim) (quoting Fed. R. Civ. P. 9(b)); *accord Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 726 (S.D.N.Y. Mar. 31, 2021).  "The complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the

statements were fraudulent." *Williams*, 889 F.3d at 124. "Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see Setzer v.*

*Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).

      The Complaint alleges facts with sufficient particularity for the underlying wire fraud

claim. The Complaint alleges that the seven Merchant Agreements contain the following false

statements: "(1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the

merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that

the automated ACH program is labor intensive and is not an automated process, requiring the

MCA company to charge an exorbitant ACH Program Fee or Origination Fee." The Complaint

alleges how each misstatement was false: (1) that the transactions were loans because,

notwithstanding the reconciliation provision, the Merchant Agreements required fixed daily

payments, a security interest in all of FTE's receivables, and the personal guarantee of the

individual owners and because the agreements relied on the creditworthiness of FTE rather than

its customers who owed the receivables, among other reasons; (2) that FTE's required daily

payments represented a specified percentage of a good-faith estimate of its monthly receivables

purchased is belied by the Merchant Agreements themselves, all of which specify a percentage

of 13% even though the amount of receivables purchased varied dramatically from $149,900 to

$2,848,100 and the daily payments ranged from $4,999 to $49,900; (3) that FTE's required daily

payments were not for the convenience of FTE but instead were to ensure that Defendants were

paid and would not have to bear the risk of the creditworthiness of the purchased receivables and

(4) "[w]hile the Origination Fee and ACH Program Fee purportedly related to the costs of due

diligence and withdrawing the Daily Payments, Queen Funding performed little or no due

diligence, and the actual costs of the ACH withdrawals were a fraction of the fee."

The false statements are alleged with particularity.  A complaint alleging acts of mail and wire fraud are generally required to "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams*, 889 F.3d at 124.  Here, the allegedly false statements are contained in the seven Merchant Agreements, which are incorporated in the Complaint.  The Complaint also alleges with particularity what role each Defendant played in the RICO scheme.

The Complaint also sufficiently alleges use of interstate wires.  "Use of wire" includes email communication and wire transfer of money.  *See United States v. Percoco*, 13 F.4th 158, 174 (2d Cir. 2021) (email); *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013) (wire transfer of money); 18 U.S.C. § 1343.  The Complaint alleges that Defendants used emails to "originate, underwrite, service and collect upon the Agreements," which contained the false statements.  Defendants also allegedly collected amounts due under the Agreements via interstate electronic ACH debits.  Use of wires is sufficiently pleaded as are the remaining elements of the predicate act of wire fraud.

## 2.  Pattern of Racketeering Activity

The Complaint alleges sufficient facts to show a pattern of racketeering activity based on continuity of the alleged enterprise.  "The plaintiff must plead at least two predicate acts . . . and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity."  *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995) (citing § 1961(5) and *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)); *accord Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22 Civ. 1245, 2022 WL 2297768, at *9 (SDNY June 27, 2022).  RICO targets conduct that "amount[s] to or pose[s] a threat of continued criminal activity," which may be closed- or open-ended.  *Reich v. Lopez*, 858 F.3d 55,

60 (2d Cir. 2017) (quoting *H.J. Inc.*, 492 U.S. at 239) (alteration in original).  "Criminal activity that occurred over a long period of time in the past has closed-ended continuity . . . ." *Lopez*, 858 F.3d at 60 (quoting *H.J. Inc.*, 492 U.S. at 242).  The Second Circuit generally requires the predicate acts to have extended over at least two years. *Lopez*, 858 F.3d at 60 (citing *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008)).  The continuity requirement applies only to the pattern of racketeering activity for wire fraud and not unlawful debt.  *See United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) ("RICO offenses may be predicated on a single instance of collection of an unlawful debt . . . .").

The Complaint sufficiently alleges closed-ended continuity of the enterprise.  The Complaint alleges not only that Defendants defrauded Plaintiffs through a series of fraudulent Merchant Agreements, but also that such practices were part of a regular way of operating their business.  Defendants entered into seven different Merchant Agreements with Plaintiffs over the course of two years, which sufficiently alleges closed-ended continuity and a pattern of racketeering activity.  The ACH withdrawals, which also serve as the basis for the predicate of wire fraud, were a "regular means of collecting on the [Merchant Agreements]." *Haymount Urgent Care PC*, 2022 WL 2297768, at *9.  The Complaint sufficiently alleges a violation of RICO predicated on a pattern of wire fraud activity.

### C.  Unlawful Debt

Defendants argue that the RICO claim cannot be based on the collection of an unlawful debt because that there was no unlawful debt.  This argument is unpersuasive because the Complaint sufficiently alleges an unlawful debt.

RICO defines "unlawful debt" as a debt (A) "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury,"

and (B) "which was incurred in connection with . . . the business of lending money or a thing of

value at a rate usurious under State or Federal law, where the usurious rate is at least twice the

enforceable rate . . . ."  18 U.S.C. § 1961(6).

"Usury laws apply only to loans or forbearances, not investments.  If the transaction is

not a loan, there can be no usury, however unconscionable the contract may be."  *Seidel v. 18 E.*

*17th St. Owners*, 598 N.E.2d 7, 11-12 (N.Y. 1992) (citation omitted) (internal quotation marks

omitted).  Under New York law, "[w]hen determining whether a transaction is a loan, substance -

- not form -- controls."  *Adar Bays*, *LLC v. GeneSYS ID, Inc*., 179 N.E.3d 612, 621-22 (N.Y.

2021).  Courts must examine whether the plaintiff "is absolutely entitled to repayment under all

circumstances" and the "principal sum advanced is repayable absolutely."  *See LG Funding, LLC*

*v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dep't 2020).

Put differently, when determining whether a transaction was a true sale of receivables or

a loan, "[t]he root of [the analysis] is the transfer of risk.  Where the lender has purchased the

accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the

performance of the accounts is direct, that is, the lender and not the borrower bears the risk of

non-performance by the account debtor."  *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67

F.3d 1063, 1069 (2d Cir. 1995); *accord Haymount Urgent Care PC*, 2022 WL 2297768, at *6.

Courts have considered, among others, the following three factors to analyze who bears the

ultimate risk that the borrower's customers will not pay: (1) whether there is a reconciliation

provision; (2) whether the agreement has an indefinite term and (3) whether the lender has any

recourse should the merchant declare bankruptcy.  *See LG Funding*, 122 N.Y.S.3d at 312; *see,*

*e.g.*, *Davis v. Richmond Cap. Grp., LLC*, 150 N.Y.S.3d 2, 5 (1st Dep't 2021) (holding the RICO

claim based on unlawful debt was sufficiently alleged based on allegations that "defendants

refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount, and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's inability to pay or bankruptcy"); *Haymount Urgent Care PC*, 2022 WL 2297768, at *7 (same on a motion to dismiss). The issue is "ultimately about whether the transaction represented a real transfer of risk . . . so the economic substance of the transaction was a loan, not a purchase of receivables." *Id.*; *see Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20 Civ. 5120, 2022 WL 1997207, at *10 (S.D.N.Y. June 6, 2022) (holding in a summary judgment motion that the three *LG Funding* factors and other considerations suggested that the purchase of receivables in reality constituted a loan).[1]

### 1. Reconciliation Provision

The Complaint's alleged facts are sufficient to plead that the transactions between FTE and Queen Funding were loans. The first *LG Funding* factor is whether there was a reconciliation provision. By its terms, the reconciliation provision in the Merchant Agreements is to ensure that the sum of FTE's daily payments to Queen Funding in any given month actually is 13% of its monthly receipts. In theory, the presence of such a provision would suggest that the transaction is not a loan, but rather a purchase where Queen Funding bears the risk of loss if receivables are not paid.

---

[1] On June 8, 2022, Plaintiffs filed a notice of supplemental authority and attached the opinion in *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, No. 20 Civ. 5120, 2022 WL 1997207 (S.D.N.Y. June 6, 2022). Defendants moved to strike based on Federal Rule of Appellate Procedure 28(j), arguing that the notice is irrelevant. The motion to strike is denied as the decision is relevant to the legal issues in this case.

Here, the Complaint sufficiently and plausibly alleges that the reconciliation provision was a "sham." First, Defendants "do[] not have a reconciliation department, do[] not perform reconciliations, and [have] never refunded a merchant money as required under their sham reconciliation provision."

Second, the Merchant Agreements by their terms do not to require a reconciliation. The Merchant Agreement contains a provision that permits the merchant to request Queen Funding to reconcile the daily payment amount going forward to more closely reflect the agreed upon 13%.[2] The "Addendum to Secured Merchant Agreement" further provides that the merchant may request a reconciliation to ensure that the amount FTE actually paid for a prior month is 13% of its actual receipts.[3] In each case, any obligation that Queen Funding may have is contingent on the merchant's providing documentation requested by Queen Funding "in its sole judgment" and

---

[2] Paragraph 1.4 of the Merchant Agreement states: "The Specific Amount is intended to represent the Specified Percentage of Merchant's Receipts each calendar month. At any time, [Queen Funding] may adjust the Specific Amount so that the amount received by [Queen Funding] in the future more closely represents the Specified Percentage. Also, once each calendar month Merchant may request that [Queen Funding] reconcile Merchant's actual receipts and adjust the Specific Amount so that the amount received by [Queen Funding] in the future more closely represents the Specified Percentage. Upon receipt of a written reconciliation request from Merchant, [Queen Funding] may request any and all information from Merchant that [Queen Funding], in its sole judgment, believes is necessary to accurately reconcile the amount [Queen Funding] has received from Merchant with the actual Specified Percentage. [Queen Funding] shall not be required to adjust the Specific Amount until such time as it has received all such requested information."

[3] Paragraph c. states: "At the Merchant's option, within five (5) business [sic] following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Queen Funding may ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Queen Funding -- but in no event later than five (5) business days following the end of the calendar month -- the Merchant must produce any and all evidence and documentation requested by Queen Funding in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage."

in its "sole and absolute discretion," respectively.  Queen Funding consequently has the absolute ability to nullify any obligation to reconcile.

Moreover, the Addendum expressly states that Queen Funding has no obligation to reconcile any past payments in excess of the 13% and describes the potential reconciliation as "a courtesy, and that Queen Funding is under no obligation to provide same."  The Addendum goes on to emphasize that "if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then Queen Funding shall not effectuate the reconciliation discussed above."

### 2.  Indefinite Term

The *LG Funding* second factor is whether the Merchant Agreements have an indefinite term.  A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collectable.  *See Fleetwood Servs.,*, 2022 WL 1997207, at *9 ("If the term is indefinite, then it is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.") (internal quotation marks omitted).  The Master Agreement provides for a seemingly indefinite term, in stating that the merchant must continue to pay the daily amount until it has fully paid the amount of receivables that Queen Funding purportedly purchased -- i.e., the amount FTE owes for the cash advance.  However, a de facto fixed term plausibly exists.  The period of payment can be easily calculated by dividing the amount FTE owes by the amount of daily payments.  A failure to pay will not indefinitely extend the term because the Merchant agreement provides that a default will occur if two daily payments are not made during the term of the agreement and the merchant does not contact Queen Funding in advance.  Upon an event of Default, Queen Funding has the right to exercise all remedies in

12

connection with the Agreement, including accelerating the debt and collect the entire amount

owed, enforcing its security interest in the collateral (i.e., all of FTE's receivables) and enforcing

the guarantee.

### 3. Lender Recourse in an Event of Bankruptcy

The third *LG Funding* factor is whether the lender has recourse should the

merchant declare bankruptcy.  If the merchant's bankruptcy triggers a default, this factor

would weigh in favor of finding the agreement to be a loan because it would suggest that

the lender has not assumed the risk of loss of not collecting on the receivables but instead

is relying on the creditworthiness of the borrower to be repaid.  *See Fleetwood Servs.*,

2022 WL 1997207, at *9 ("In determining whether the merchant retains the risk of

nonpayment, it is significant that 'the agreement provides that [defendant's] written

admission of its inability to pay its debt or its bankruptcy constitute events of default

under the agreement, which entitle the plaintiff to the immediate full repayment of any of

the unpaid purchased amount.'") (quoting *LG Funding*, 122 N.Y.S.3d at 313).

This factor weighs in favor of finding the transactions to be loans.  The Merchant

Agreements' exacting event of default provision, the "Protections against Default"

provision making payment due immediately and permitting seizure of the collateral in

case of a default and the personal guaranty provision effectively shield the lender from

the risk of loss when the creditor is nearly or actually bankrupt.  The lender bears nearly

no risk of the receivables' non-performance and would recover the Purchased Amount

even if the receivables turned out to be uncollectable.

### 4.   Other Factors Affecting Ultimate Transfer of Risk

In addition to the three *LG Factors*, the Complaint alleges additional facts to show that the transactions were loans.  The repayment and remedy terms of the Merchant Agreements shield Defendants from the risk that the purchased receivables may be uncollectable.  For example, an "Event of Default" occurs if "attempted ACH debit of the Specific Daily Amount is rejected two times during the term of [the Merchant Agreement] and the Merchant does not contact [Queen Funding] in advance of the ACH debit being rejected."  In such cases, payment becomes immediately due and Defendants are allowed to foreclose on the collateral, including any collateral held by the guarantor.  For this reason as well, Defendants bore no "real transfer of risk," and therefore, "the economic substance of the transaction was a loan, not a purchase of receivables."  *Haymount Urgent Care PC*, 2022 WL 2297768, at *7.  On balance, the Complaint pleads sufficient facts to show that the transactions reflected in the Merchant Agreements are loans subject to usury laws.  *See Davis. v. Richmond Capital Group*, 150 N.Y.S.3d 2, 4 (1st Dep't 2021).

### 5.   Usury

The usury element of unlawful debt under RICO is also adequately pleaded.  RICO prohibits an enterprise's collection of unlawful debt.  18 U.S.C. § 1962 (c).  "Unlawful debt" under RICO is a debt "which is unenforceable under State or Federal law . . . because of the laws relating to usury," and "where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).  Under New York law, a loan is usurious if the interest rate exceeds "six per centum per annum," N.Y. Gen. Oblig. L. § 5-501 and criminally usurious if it has an interest rate "exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period," N.Y. Penal Law § 190.40.  The effective interest rates of the Merchant Agreements

range from 100% to 300% per annum, which far exceed the New York criminal usury law's limit of 25%. Usurious intent, which is usually a question of fact for the jury, is also adequately alleged. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 623 (N.Y. 2021). The Complaint sufficiently and plausibly alleges collection of unlawful debt in violation of RICO.

### D. Standing

Defendants' argument that Plaintiffs lack standing because the Complaint does not allege "definite damages" or injury is unpersuasive. To satisfy RICO's standing requirements, a plaintiff must demonstrate "(1) a violation of [18 U.S.C. §] 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (per curiam) (quoting *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990)) (internal quotation marks omitted); *accord Black v. Ganieva*, No. 21 Civ. 8824, 2022 WL 2374514, *26 (S.D.N.Y. June 30, 2022). "RICO standing is a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *accord Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 21-847, 2022 WL 480475, at *2 (2d Cir. Feb. 17, 2022) (summary order). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994); *accord Black*, 2022 WL 2374514, *26.

Plaintiffs plead allegedly fraudulent agreements or usurious debt. All of Plaintiffs' payments pursuant to the Merchant Agreements apparently have been made. What amounted to allegedly fraudulent or usurious interest payments represent concrete injury and damage sufficient to establish standing. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir.

2003) ("To satisfy RICO's standing requirements, a plaintiff must demonstrate . . . a violation of [RICO] [and] injury to business or property . . . .").

The case cited by Defendants is inapposite.  In *First Nationwide Bank v. Gelt Funding Corp.*, plaintiffs brought a RICO claim against loan brokers whose loans defaulted at a higher rate.  27 F.3d 763, 767 (2d Cir. 1994).  Defendants argued that a portion of plaintiffs' claim for damages was based on loans that "had not been sold, foreclosed, or restructured" and from which plaintiffs suffered no damages.  *See id.*  The Second Circuit held that "with respect to those loans not foreclosed, [plaintiff] has not alleged an injury ripe for suit under RICO."  *Id.* at 772.  In our case, Plaintiffs sufficiently allege that they suffered damages based on the fraudulent or otherwise unenforceable interest payments.

### E.  Statute of Limitations

Defendants are incorrect that the claims are barred by the statute of limitation.  RICO claims are subject to a four-year statute of limitations.  *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *accord Simmons v. Reich,* No. 20-4114, 2021 WL 5023354, at *2 (2d Cir. Oct. 29, 2021).  The statute of limitations for RICO is unaffected by the predicate act's statute of limitations, even when the predicate act arises out of a state law claim.  *United States v. Paone*, 782 F.2d 386, 393 (2d Cir. 1986); *accord Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 711 (S.D.N.Y. 2021).  The Complaint was filed on November 19, 2021, which is one day less than four years from the date the first Merchant Agreement was signed.  The claims are timely.

### F.  Other Elements of RICO Violation

Contrary to Defendants' arguments, the Complaint sufficiently pleads the other elements of a RICO violation sufficient to state a claim.  The Complaint sufficiently alleges an

"enterprise," which is distinct from the "person" who has violated RICO. Any legal entity may qualify as a RICO enterprise, 18 U.S.C. § 1961(4), and "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its difference legal status." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001); *accord In re Arab Bank, PLC Alien Tort Statute Litig.*, 822 F.3d 34, 40 (2d Cir. 2016) (Cabranes, J., concurring). Queen Funding is a legal entity that falls within the definition of a RICO enterprise and is distinct from Klein, a natural person. *See, e.g.*, *Fleetwood Servs.*, 2022 WL 1997207, at *19 (finding an MCA company to be an enterprise under RICO); *Haymount Urgent Care PC*, 2022 WL 2297768, at *9 (same).

### G. RICO Conspiracy

The Complaint's RICO conspiracy claim also survives. Defendants' only argument is that the conspiracy claim fails because the underlying substantive RICO claim fails. For reasons above, this argument is without merit.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The stay of discovery is lifted. By July 27, 2022, the parties shall file a proposed case management plan as outlined in the Court's Individual Rules. The Clerk of Court is respectfully directed to close the motions at Dkt. No. 19 and 34.

Dated: July 20, 2022
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**